IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONY L. BENNETT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL WENEROWICZ, et al. | : | NO.  13-1203 |

**REPORT AND RECOMMENDATION**

ELIZABETH T. HEY, U.S.M.J.                                    May 29, 2014

This is a pro se petition for writ of habeas corpus filed pursuant to 28 U.S.C.

§ 2254, by Tony L. Bennett ("Bennett"), who is currently incarcerated at the State

Correctional Institution in Graterford, Pennsylvania.  For the reasons that follow, I

recommend that the petition be denied.  However, because I conclude that reasonable

jurists could disagree about the constitutionality of the jury charge given at his trial, I

recommend that a Certificate of Appealability ("COA") issue.

I.      **FACTS AND PROCEDURAL HISTORY**

On March 10, 1992, after a trial before the Honorable Juanita Kidd Stout of the

Court of Common Pleas of Philadelphia County, a jury convicted Bennett of first-degree

murder, possessing instruments of crime, two counts of robbery, and criminal conspiracy.

N.T. 3/10/92 at 903-11.[1]  The Pennsylvania Supreme Court later summarized the facts as

follows:

_____

[1]At the time of Bennett's trial, Justice Stout had retired from the Pennsylvania
Supreme Court and returned to the Court of Common Pleas.  She is referred to as Justice
Stout throughout Bennett's proceedings and will be referred to as Justice Stout in this
Report.

> [Bennett] conspired with four individuals, Michael Mayo, Kecia Ray, Kevin Wyatt, and Paul Johnson, to rob a jewelry store in Philadelphia at gunpoint. The store was selected because a salesperson, Ms. Ju Yang Lee, had made what the conspirators believed to be an insultingly low offer for a gold chain that Mayo and Johnson earlier had sought to pawn. Appellee Bennett supplied the loaded gun, but did not enter the store, remaining in the getaway car with Wyatt. Mayo and Johnson were caught on videotape entering and robbing the store. During the robbery, Mayo shot Ms. Lee with [Bennett's] gun, killing her.
>
> The shooter Mayo and Ray pleaded guilty to murder, while [Bennett], Wyatt, and Johnson – all non-shooters – were jointly tried for murder and related crimes before the Honorable Juanita Kidd Stout. Ray testified for the Commonwealth, providing evidence of the conspiracy and testifying that [Bennett] directly abetted the conspiracy by supplying the loaded gun.

Commonwealth v. Bennett, 57 A.3d 1185, 1187 (Pa. 2012). After further deliberations, the jury returned with a sentence of life imprisonment for murder. N.T. 3/11/92 at 1044-45. On June 1, 1993, after denying post-verdict motions, Justice Stout sentenced Bennett, in accordance with the jury's verdict, to life imprisonment for murder, and additional terms of imprisonment for the other offenses.[2] Bennett did not file a direct appeal.

On April 5, 1995, Bennett filed a pro se petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541-9551, claiming:

1. Trial counsel was ineffective for failing to investigate the crime scene and the alleged conspiracy,

2. Trial counsel was ineffective for failing to object to the court's instruction on first-degree murder,

---

[2]Specifically, Justice Stout sentenced Bennett to 10-20 years' imprisonment for each of the robbery counts, and 2½ -to- 5 years for possessing instruments of crime. These sentences were consecutive to one another and concurrent to the life sentence for murder. The sentence was suspended on conspiracy. N.T. 6/1/93 at 20.

3. Trial counsel was ineffective for failing to object and request a mistrial when the prosecutor introduced a statement by a non-testifying alleged co-conspirator,

4. The trial court abused its discretion in improperly instructing the jury, and

5. Petitioner was denied his right to confront witnesses when the Commonwealth introduced a statement of an alleged co-conspirator through the testimony of a police officer.

Commonwealth v. Bennett, Nos. 021, 022, 024, July Term 1990, PCRA Petition (Phila. C.C.P. filed Apr. 5, 1995).  On April 9, 1997, counsel filed an amended PCRA petition on Bennett's behalf.  On February 19, 1999, the Honorable Ricardo Jackson dismissed the PCRA petition.[3]  Commonwealth v. Bennett, No. 9007-0010-2/2, Docket Sheet at 8 (Phila. C.C.P.).  In a later filed opinion, Judge Jackson found the bulk of Bennett's claims meritless, and rejected claims based on an allegedly faulty accomplice liability charge as merely bald assertions of error without any specificity.  Commonwealth v. Bennett, No. 0010, July Term, 1990, Opinion at 5 (Phila. C.C.P. October 6, 1999).

_____

[3]Bennett's case was reassigned to Judge Jackson after Justice Stout's death.

Bennett filed a timely appeal,[4] which was ultimately addressed on the merits by

the Superior Court following a tortuous path through the state court system.[5]  On March

_____

[4]While Bennett's appeal was winding its way through the state court system, the
Superior Court considered a claim presented by Bennett's codefendant, Wyatt, that the
jury instruction was flawed.  The Superior Court held, "the charge of the court
impermissibly permitted the jury to convict [Wyatt] of first degree murder without a
showing of a specific intent to kill or a shared intent."  Commonwealth v. Wyatt, No.
EDA 1999 at 13 (Pa. Super. Jul. 16, 2001).  At that time, the court relied primarily on the
Pennsylvania cases of Commonwealth v. Bachert, 412 A.2d 580 (Pa. Super. 1979), and
Commonwealth v. Huffman, 638 A.2d 961 (Pa. 1994).  As will be explained, by the time
Bennett's appeal reached the Pennsylvania Supreme Court, subsequent caselaw provided
further clarification on issue of specific intent and accomplice/co-conspirator liability.
      Bennett has not raised the claim, also rejected by the Pennsylvania Supreme Court,
that his constitutional rights are violated if he does not obtain the same relief as Wyatt for
the same error.  See Bennett, 57 A.3d at 1204-08.

[5]Bennett's original PCRA appeal was dismissed on August 14, 2000, for failure to
file a brief.  See Superior Court Docket Sheet – Appeal D.P. 259.  On October 27, 2000,
Bennett filed a second PCRA petition seeking reinstatement of his right to appeal the
denial of his first PCRA petition.  See Commonwealth v. Bennett, No. CP-51-CR-
0700102-1990, Docket Sheet (Phila. C.C.P.) ("Common Pleas Docket Sheet").  The
Honorable Kathryn Lewis granted his petition and reinstated his appellate rights on
September 28, 2001, and counsel filed the appeal in the Superior Court on December 14,
2001.  See Common Pleas Docket Sheet; Superior Court Docket Sheet – Appeal D.P. #
1346.  On February 4, 2004, the Superior Court quashed the appeal because Bennett's
second PCRA petition was untimely.  Commonwealth v. Bennett, 842 A.2d at 953 (Pa.
Super. 2004).  Bennett appealed.  The Pennsylvania Supreme Court reversed the Superior
Court on August 23, 2007, and remanded the case to the PCRA court to determine
whether Bennett qualified for a statutory exception to the PCRA's time bar.
Commonwealth v. Bennett, 930 A.2d 1264 (Pa. 2007).
      After an evidentiary hearing, Judge Jackson found that Bennett's petition qualified
for a statutory exception and reinstated his right to appeal the denial of the first PCRA
petition to the Superior Court on December 20, 2007.  See Commonwealth v. Bennett,
No. 0010 2/2, July Term, 1990, Order (Phila. C.C.P. Dec. 20, 2007).  Relevant to this
habeas petition, on appeal, Bennett argued that the trial court's accomplice liability
instruction denied him due process and his counsel was ineffective for failing to object to
the instruction.  The Superior Court found that Bennett had adequately pled his
accomplice liability charge claim and the related ineffective counsel claim,
Commonwealth v. Bennett, No. 343 EDA 2008 at 18-19 (Pa. Super. Oct. 17, 2008), and
remanded the case to the PCRA court for further consideration.  In its opinion, the

28, 2011, the Superior Court concluded that the jury instruction on accomplice liability

was flawed because it allowed the jury to convict Bennett of first-degree murder without

the requisite intent, and that counsel was ineffective for failing to object to the charge.

Bennett, 19 A.3d at 544.  The Commonwealth filed an appeal.  On December 28, 2012,

the Pennsylvania Supreme Court reversed, finding no error in the accomplice instruction.

Bennett, 57 A.3d at 1202.[6]

On March 4, 2013,[7] Bennett filed this pro se petition for habeas corpus and

attached memorandum of law asserting that the court's accomplice/co-conspirator

_____

Superior Court referenced its prior opinion granting relief to Bennett's co-defendant, Kevin Wyatt, finding that the accomplice liability instruction permitted the jury to convict him of first-degree murder without a showing of a specific intent to kill or a shared intent.  Id. at 13-14 (citing  Commonwealth v. Wyatt, No. 2050 EDA 1999 (Pa. Super. Jul. 16, 2001)).

On August 19, 2010, Judge Jackson granted Bennett's PCRA petition and ordered a new trial on first degree murder.  Commonwealth v. Bennett, No. CP-51-CR-0700102-1990, Order (Phila. C.C.P. Aug. 19, 2010).  Relying on the Superior Court's decision in Wyatt's case, Judge Jackson explained in his later opinion that Bennett was entitled to a new trial based upon an erroneous accomplice liability instruction and the related ineffective assistance of counsel.  Commonwealth v. Bennett, No. CP-51-CR-0700102-1990, Opinion (Phila. C.C.P. Oct. 21, 2010).  The Commonwealth filed an appeal, leading to the Superior Court's March 28, 2011 decision affirming Judge Jackson.  Commonwealth v. Bennett, 19 A.2d 541 (Pa. Super. 2011).

[6]Although the Pennsylvania Supreme Court remanded the case to the PCRA Court with direction to dismiss the PCRA petition, it does not appear from the state court docket that the PCRA court has issued that order.  See Common Pleas Docket Sheet. This court was informed that the Clerk of Quarter Sessions does not have the state court record because it remains in the Superior Court.  The District Attorney has not challenged this court's jurisdiction and I will construe the Pennsylvania Supreme Court's order as the final decision on the claims Bennett has presented to this court.  Because I could not obtain the state court record, the District Attorney provided a copy of the trial transcript.

[7]Although Bennett's petition was docketed on March 6, 2013, the federal court employs the "mailbox rule," deeming the petition filed when given to prison authorities

5

liability instruction violated his due process rights and that he was denied the effective assistance of counsel because his lawyer failed to object to the allegedly erroneous instruction.  See Docs. 1 ¶ 12 GROUND ONE & GROUND TWO, 1-1 at 4.  The District Attorney filed a response on June 17, 2013, arguing that both of Bennett's claims are meritless.  See Doc. 8.  Bennett filed a reply and a supplement on July 9, 2013, and a second supplement on April 8, 2014.  See Docs. 10-12.

## II.   LEGAL STANDARD FOR MERITS REVIEW

The federal courts' habeas review is limited in nature.  The Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996, amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254.  Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000). AEDPA increased the deference federal courts must give to the factual findings and legal determinations of the state courts.  Id. at 196 (citing Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)).  Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, a petition for habeas corpus may only be granted if (1) the state court's adjudication of the claim "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Factual issues determined by a state court are

---

for mailing.  Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (citing Houston v. Lack, 487 U.S. 266 (1988)).  Bennett signed his petition on March 4, 2013, and I will assume that he gave the petition to prison authorities for mailing on that date.

presumed to be correct, rebuttable only by clear and convincing evidence.  Werts, 228
F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal
habeas court may grant the writ if the state court arrives at a conclusion opposite to that
reached by [the Supreme] Court on a question of law or if the state court decides a case
differently than [the Supreme] Court has on a set of materially indistinguishable facts."
Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  With respect to "the 'unreasonable
application' clause, a federal habeas court may grant the writ if the state court identifies
the correct governing legal principle from [the Supreme] Court's decisions but
unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  The
"unreasonable application" inquiry requires the habeas court to "ask whether the state
court's application of clearly established federal law was objectively unreasonable."  Id.
at 409.  As the Third Circuit has noted, "an unreasonable application of federal law is
different from an incorrect application of such law and a federal habeas court may not
grant relief unless that court determines that a state court's incorrect or erroneous
application of clearly established federal law was also unreasonable."  Werts, 228 F.3d at
196 (citing Williams, 529 U.S. at 411).[8]

_____

[8]In his most recent supplement, Bennett argues that this court should employ de
novo review because the Pennsylvania Supreme Court did not decide his due process
issue.  See Doc. 12.  Despite the Pennsylvania Supreme Court's reliance on state case
law, its analysis is rooted in the right to effective assistance of counsel and in the due
process concept that the charge cannot relieve the Commonwealth of its burden to prove
an element of the offense -- specifically specific intent as to each defendant charged with
first-degree murder.  Bennett, 57 A.3d at 1199-1203.  Therefore, the AEDPA standard of
review applies.  See Early v. Packer, 537 U.S. 3, 23-24 (2002) (AEDPA deference "does

7

III.  **DISCUSSION**[9]

Bennett alleges that his counsel was ineffective for failing to object to the court's charge on accomplice/co-conspirator liability and contends that the court's charge amounted to a violation of due process.  According to Bennett, the charge permitted the jury to find him "guilty of first-degree murder for aiding and abetting the robbery, and that [the shooter's] intent to kill impute[d] to [Bennett] and all of the accomplices."  Doc. 1-1 at 10.  The District Attorney responds that under the circumstances of the case and when read in its entirety, the jury instruction comported with due process, and the Pennsylvania Supreme Court's decision was not contrary to nor an unreasonable determination of federal law.  Doc. 8 at 18-20.  Thus, argues the District Attorney, the ineffectiveness claim also fails.  Id. at 24-25.  I begin by addressing the underlying claim of a due process violation.

A.  **Due Process**

Under well-settled Pennsylvania law, specific intent to kill is an element of first-degree murder, including for defendants charged as accomplices or co-conspirators.

_____

not require citation of [federal] cases – indeed, it does not even require awareness of [federal] cases, so long as neither the reasoning nor the result of the state court decision contradicts them.").

[9]Albeit he was convicted in 1992, Bennett's habeas petition is timely filed.  His conviction became final July 1, 1993, when time expired to file a direct appeal.  However, the habeas limitations period did not begin to run until April 24, 1996, when AEDPA was enacted.  See Burns v. Morton, 134 F.3d 109, 111 (3d Cir. 1998) (application of habeas limitations period prior to enactment date would be impermissibly retroactive).  At that time, Bennett's first PCRA petition was pending.  Although he did not file a timely appeal of the denial of PCRA relief, the state courts reinstated his appellate rights nunc pro tunc, and the appeal was not completed until December 29, 2012.  Thus, the habeas petition he filed 65 days later on March 4, 2013, is timely.

Therefore, a trial court must instruct that a jury can only find a defendant guilty of first-degree murder as an accomplice or co-conspirator if he possessed the specific intent to kill.  See Everett v. Beard, 290 F.3d 500, 512-513 (3d Cir. 2001); Smith v. Horn, 120 F.3d 400, 410 (3d Cir. 1997) (citing 19 Pa. Cons. Stat. Ann § 2502(a)); Huffman, 638 A.2d at 962-63, 964; Bachert, 453 A.2d at 935; see also Williams v. Beard, 637 F.3d 195, 220 (3d Cir. 2011) ("due process requires that each element of the charged offense be proved beyond a reasonable doubt") (citing In re Winship, 397 U.S. 358, 364 (1970)).  If the court's charge to the jury "allowed the jury to find that [the defendant] was an accomplice to first degree murder without finding that he possessed the mens rea required for that offense, then the instructions were constitutionally infirm."  Williams, 637 F.3d at 220.

In the context of habeas review, "[t]he propriety of the court's charge is closely intertwined with the evidence and argument brought forth at trial."  Williams, 637 F.3d at 221.  Therefore,

> a habeas petitioner must demonstrate both (1) that the instruction contained "some 'ambiguity, inconsistency, or deficiency,'" and (2) that there was " 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  . . . Satisfaction of this two-part inquiry requires a federal habeas court to "focus initially on the specific language challenged," . . . and then to review the challenged instruction in the context of the entire charge and in light of the evidence and arguments presented at trial . . . .  In this fashion, a due process analysis depends as much on the language of the court's charge as it does on the particularities of a given case.  In other words, the inquiry requires careful consideration of each trial's unique facts, the narratives presented by the parties, the arguments counsel

delivered to the jurors before they retired to deliberate, and
the charge as a whole.

Id. at 223 (citing and quoting, inter alia, Waddington v. Sarausad, 555 U.S. 179, 187

(2009); Middleton v. McNeil, 541 U.S. 433, 437 (2004); Estelle v. McGuire, 502 U.S. 62,

72 (1991); Smith, 120 F.3d at 411.

Accordingly, it is essential first to review the charge as a whole for errors and

ambiguities, and second to assess the impact of the charge in light of the evidence and

arguments.  In Williams, for example, a petitioner convicted of first-degree murder

challenged the trial court's accomplice liability instruction.  The Third Circuit, assuming

for the sake of argument that there was some ambiguity in the accomplice instruction,

concluded that there was "no reasonable likelihood that the jury applied the instruction in

a manner that relieved the Commonwealth of its burden of proof with respect to first

degree murder."  637 F.3d at 223.  After evaluating the charge and the evidence, the

Third Circuit determined that the jury was left with two possibilities -- either Williams

was the principal killer or he played no role in the robbery and murder.  Id.  Under these

circumstances, the court concluded that even if the accomplice liability charge was

ambiguous, there was no reasonable likelihood that the jury instruction relieved the

Commonwealth of the burden of proving the specific intent to kill.  Id.  In contrast, in

Laird v. Horn, 414 F.3d 419 (3d Cir. 2005), the evidence showed that the two defendants

acted together to kidnap the victim, but both testified and accused the other of

committing the murder.  Under these circumstances, an erroneous accomplice liability

instruction allowed the jury to convict Laird without a finding that he intended to kill the victim.[10]

In the memorandum attached to his petition, Bennett explains that he takes issue with specific excerpts of the jury instructions regarding conspiracy and accomplice liability.  See Doc. 1-1 at 9.  Because the charge must be considered in its entirety in considering Bennett's due process challenge, rather than providing the excerpts out of context, I will provide the jury instructions relating to conspiracy, accomplice liability, and first degree murder in their entirety and then discuss Bennett's contentions.  For ease of later reference, pertinent paragraphs will be numbered.

> Now, the defendants come before you charged with criminal conspiracy, the criminal objective of which was murder, robbery, possession of an instrument of crime and violation of the Uniform Firearms Act and the overt act is they did shoot the victim.
> Now, the definition of criminal conspiracy is as follows:
> [1]A person is guilty of conspiracy with another person or persons to commit a crime if, with the intent of promoting or facilitating its commission, he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or agrees to aid such other person or persons in the planning or commission of such crime.
> In addition, in order for a person to be convicted of conspiracy to commit a crime an overt act in pursuance of such conspiracy must be alleged and proved to have been done by him or by a person with whom he conspires.
> The evidence to sustain a charge of conspiracy must be such as reasonably and naturally justifies an inference of guilt

---

[10]Williams and Laird are mentioned to illustrate the importance of the fact scenario at issue.  Neither is controlling here because the Third Circuit in each case applied de novo review rather than AEDPA deferential review.  See Williams, 637 F.3d at 221; Laird, 414 F.3d at 424-25.

of the accused, and of such volume and quality as to overcome the presumption of innocence and satisfy you, the jury, of the accused's guilt beyond a reasonable doubt.

A conviction may not be based solely on suspicion and conjecture.

No explicit or formal agreement need be shown. However, in order to establish a criminal conspiracy, the agreement may be inferred from concerted acts. The essence of every criminal conspiracy is a common understanding no matter how it comes into being.

A common understanding or agreement is the heart of every conspiracy.

A conspiracy may be proven inferentially by showing the relations, conduct or circumstances of the parties and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed.

To be guilty of conspiracy and the crime that are the products thereof, it is not necessary for a person to join the conspiracy at its inception. Collusive behavior of the participant is sufficient to establish the necessary elements of shared criminal intent and agreement.

[2]Where two or more join in the commission of an unjustified assault which results fatally, all are guilty regardless of which one inflicts the mortal wounds. When two or more combine to commit a felony or to make an assault, and in carrying out the common purpose another is killed, the one who enters into the combination but not [sic] does not personally commit the wrongful act is equally responsible for the homicide as the one who directly causes it.

Co-conspirators are not relieved of liability because he [sic] is not present at the execution of the crime.

Where the existence of a conspiracy is established the law imposes upon the conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators, if such acts are done in pursuance of the common design or purpose of the conspiracy.

[3]Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator and conspirators, and extend even to a homicide which is the consequence even though such homicide is not specifically contemplated by the parties.

Now, one may be legally accountable for conduct of another not only if he is a co-conspirator, but also if he is an accomplice who aids and abets the commission of a crime.

Conspiracy is not synonymous with aiding and abetting. Conspiracy requires an agreement to commit a crime, plus an overt act. Aiding and abetting requires participation in the act constituting the offense.

The Criminal Code provides in relevant part that a person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the offense.

[4]It also says that a person is an accomplice of another person in the commission of an offense if, with the intent of promoting or facilitating the commission of the offense, he aids or agrees or attempts to aid such person in planning and committing it.

[5]To aid and abet in the commission of a crime one must possess a shared intent to commit it. One is an aider and abettor in the commission of a crime if he has joined in its commission, if he was an active partner in the intent which was the crime's basic element.

[6]The degree of concert or collusion between parties to an illegal transaction means the act of one is the act of all. If on the other hand one is only a terrified onlooker, neither his presence at the homicide nor this failure to report it will make him and accomplice and aider and abettor or co-conspirator.

One may withdraw from a conspiracy, however. Withdrawal from a conspiracy requires an affirmative act bringing home the fact of the withdrawal to his con-conspirators made in time for his co-conspirators to effectively abandon the conspiracy, and in a way which would be sufficient to inform a reasonable man of the withdrawal.

The withdrawal must be completed before the overt act which was the object of the conspiracy has been committed.

Stated in another way, in order to justify a finding of withdrawal or abandonment, the actor must have abandoned the scheme appreciably before the crime occurs, and he must have communicated his intention to his co-conspirators so that they also would have the opportunity of abandoning the scheme, and on these bills charging each defendant with

13

conspiracy, you may find each defendant either guilty or not guilty.

Each defendant comes before you charged with murder and voluntary manslaughter.

Now, on this bill, you may find each defendant guilty of murder in the first degree, guilty of murder in the second degree, or guilty of murder in the third degree, or guilty of voluntary manslaughter, or not guilty.

I shall define each of these crimes for you.

First, as to murder, in all murder, regardless of the degree, there is an element that we call malice, and malice has a legal definition which is as follows:

Malice consists of either an express intent to kill or an express intent to inflict great bodily harm, or of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty which indicates an unjustified disregard for the likelihood of death or great bodily harm and an extreme indifference to the value of the human life.

Real malice may be inferred and found from the attending circumstances of the act resulting in death.

I shall now define murder in the first degree.

A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.  As used in this statute, intentional killing means among other things a willful, deliberate and premeditated killing.

A killing is willful and deliberate if the defendant consciously decided to kill the victim and it is premeditated if the defendant possessed a fully-formed intent to kill at the time when he acted and though there need not have been any appreciable amount of time between the time when the defendant first conceived the idea of killing and the time when he acted.

The design to kill can be formulated in a fraction of a second.

In determining whether or not the defendants committed said kind of intentional killing required for first degree murder, you should consider the testimony of expert witnesses, as well as all other evidence which may shed light on what was going on in the defendant's mind at the time of the alleged killing.

>       If a defendant intentionally uses a deadly weapon on a
> vital part of the body, you may infer from this that the killing
> was intentional.
>       Specific intent as well as malice may be inferred from
> the use of a deadly weapon on a vital part of the body.

N.T. 3/9/92 at 859-66.[11]

During deliberations, the jury asked several questions including asking for the definition of criminal conspiracy, and the definitions of the differing degrees of murder. N.T. 3/10/92 at 888-89.  In response, Justice Stout reiterated the instructions she had previously given.  Id. at 889-96.

Bennett refers to several portions of the conspiracy and accomplice liability portions of the charge to argue that the jury was permitted to find him guilty of first-degree murder without the requisite specific intent to kill.  Specifically, Bennett complains that the court instructed the jury that the objective of the conspiracy was, among other things, murder, see Doc. 1-1 at 9, that the conspiracy charge included assault, which was not charged, and imposed responsibility for the homicide on any co-conspirator to the robbery.  Id. at 9-10.  Likewise, Bennett complains that the accomplice charge allowed the jury to find him guilty of first-degree murder for aiding and abetting the robbery.  Id. at 11.  In sum, Bennett argues that the charge permitted the jury to convict him of first-degree murder based upon the specific intent of Mayo, the shooter. Id. at 4.

---

[11]The jury was also instructed on second- and third-degree murder and involuntary manslaughter.  N.T. 3/9/92 at 866-70.

Addressing the first step of the <u>Williams/Sarausad</u> two-step inquiry, I conclude that certain portions of the co-conspirator and accomplice instructions did contain some ambiguity regarding specific intent, specifically the language in paragraphs 2, 3 and 6 of the above-quoted charge.   Read in isolation, these instructions do seemingly relieve the Commonwealth of the burden of proving that Bennett had the specific intent to kill, rather than the intent to rob the store.   They stand in contrast to the language in paragraphs 1, 4, and 5 quoted above, which instruct that a conspirator or accomplice must have the intent to promote or commit the crime at issue.   The Superior Court noted this ambiguity in its decision.   Relying on <u>Commonwealth v. Huffman</u>, 638 A.2d 961 (Pa. 1994), the Superior Court stated that the charge "made no distinction between vicarious liability for first-degree murder and vicarious liability for other charged offenses such as robbery."  <u>Bennett</u>, 19 A.3d at 544.   The court concluded:

> The charge relating to accomplice and conspirator liability did not tell the jurors that they needed to find Bennett possessed the specific intent to kill before they could convict him of first-degree murder.   Rather, the instructions suggested his liability could arise simply by virtue of his joint participation with the shooter in the robbery.

<u>Id.</u>

The Supreme Court of Pennsylvania disagreed with the Superior Court.   The Pennsylvania Supreme Court acknowledged that in <u>Huffman</u> the trial court gave "a patently erroneous" charge, instructing the jury that to convict of first-degree murder "you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and therefore you must determine if the killing

16

was intentional." Bennett, 57 A.3d at 1199 n.7 (quoting Huffman, 638 A.2d at 962).

However, the Court faulted the Superior Court for ignoring subsequent caselaw.

Following the decision in Huffman, the Pennsylvania Supreme Court decided

Commonwealth v. Thompson, in which the court found no error when a proper

accomplice instruction was preceded by the definitions of the degrees of murder

including the definition of specific intent. Bennett, 57 A.3d at 1198 (citing Thompson,

674 A.2d 217, 223 (Pa. 1996)). The court observed that its decision in Huffman did not

require that "the legal concepts of accomplice liability and first degree murder be

revealed to the jury by a set pattern of magic words." Id. (citing Thompson, 674 A.2d at

223). The decision in Thompson was followed by Commonwealth v. Simpson, 754 A.2d

1264 (2000), in which the trial court told the jury that "each defendant is on trial

individually. . . . Therefore, in order to [find] the defendant guilty of murder of the first-

degree, you must find that the defendant had the specific intent to kill and that the killing

was willful, deliberate and premeditated." Bennett, 57 A.3d at 1198 (quoting Simpson,

754 A.2d at 1274-75). Considered through the lens of these case developments, the

Pennsylvania Supreme Court concluded that the first-degree murder portion of Bennett's

charge correctly instructed the jury on the law of specific intent.

> Like the instruction in Simpson, the introduction to the
> murder portion of the jury charge clarified that it pertained to
> "each" defendant. The first-degree murder charge clearly and
> correctly informed the jury that "each" defendant could be
> found guilty of first-degree murder only if "the defendant
> possessed a fully-formed intent to kill at the time when he
> acted." . . . Thus, the jury was properly informed that
> [Bennett] needed to possess the specific intent to kill in order
> for him to be found guilty of first-degree murder.

17

Id. at 1200.

Although the charge given in Bennett's case is not a model of clarity, and read in isolation, portions of the charge could have mislead the jury, the issue is whether there is a reasonable likelihood that the jury applied the challenged instructions in a way that violated the Constitution by alleviating the Commonwealth's burden to prove every element of first-degree murder beyond a reasonable doubt.  See Laird v. Horn, 414 F.3d 419, 425-26 (3d Cir. 2005) (citing Smith, 120 F.3d at 411).  But unlike the decisions in Laird and Smith, and the earlier cited Williams, in which the state court decisions were reviewed de novo, Bennett's case is subject to AEDPA deferential review.  Thus, the more specific issue is whether the Pennsylvania Supreme Court's determination that the instruction did not violate due process was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.  The Supreme Court has explained the deference due a state court opinion under AEDPA.

> [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Williams v. Taylor, 529 U.S. 362, 411 (2000).  Rather, that application must be "objectively unreasonable."  Id. at 409.

Renico v. Lett, 559 U.S. 766, 773 (2010).

As I previously mentioned, review of the court's charge is not limited to the instructions, but is intertwined with the facts and argument presented at trial.  Williams, 637 F.3d at 221.  Here, three of the conspirators in the robbery were on trial -- Bennett,

Wyatt, and Johnson.[12]  The shooter, Michael Mayo, was not on trial, and the fifth

conspirator, Kecia Ray, pled guilty to third-degree murder in exchange for her testimony

at trial.  Throughout the trial, the jury was advised and the evidence established that

Mayo shot the decedent during the robbery of the jewelry store.  See N.T. 3/2/92 at 30-31

(Commonwealth's opening describing videotape), 3/3/92 at 199 (testimony of Ray

relating what Johnson said happened), 214 (testimony of Ray identifying Mayo in the

videotape of the shooting).  The evidence established that Bennett conspired with the

others to rob the jewelry store while they were together in a Kentucky Fried Chicken, that

he handed the gun to Mayo in the restaurant, and that he and Wyatt stayed in the getaway

car while Mayo and Johnson went inside the jewelry store.  This is largely consistent with

the statements Bennett gave to police on May 21 and 25, 1990, that were recounted to the

jury, although he did not admit handing Mayo the gun.  N.T. 3/4/92 at 373-75.[13]  The

Pennsylvania Supreme Court seized upon the fact that Mayo was not on trial with

Bennett in evaluating the jury instructions.

> In the case sub judice, the issue of concern to the Court
> in Huffman was simply not present as the jury was not left to

---

[12]Throughout the testimony, the co-conspirators are referred to by their nicknames -- Johnson is "Baccardi," Wyatt is "Flave," Bennett is "Smack" -- and the shooter, Mayo, is "T.S."  N.T. 3/3/92 at 185-87 (identifications by Kecia Ray).

[13]In the first statement, Bennett discussed being in the Kentucky Fried Chicken and the plan to rob the jewelry store.  Bennett and Wyatt were to wait at the car.  Bennett denied giving Mayo the gun, but admitted that he and Mayo had bought the gun and that Mayo handed it to him after the shooting and that he later hid it.  N.T. 3/4/92 at 374-76.  In the second statement, Bennett provided information to help the police locate Mayo and recounted the conversation in the car immediately following the shooting in which Mayo said he shot the girl when she got a gun and cocked and pointed it.  N.T. 3/4/92 at 400-01.

> speculate concerning which person in the conspiracy pulled the trigger. The killer was always identified as Michael Mayo and there was no question as to his role in the killing, and the distinct roles of his conspirators. Indeed, the jury was shown a video from the jewelry store identifying Mayo as the shooter. Furthermore, Mayo was not on trial with [Bennett] and his other co-defendants. Thus, the jury was well aware that none of the co-defendants on trial were the actual shooter; and when the court's charge spoke of the defendant or defendants, it was not speaking of Mayo.
>
> Thus, the first-degree murder instruction here referred only to the non-shooter defendants actually on trial, and did not encompass Mayo.

Bennett, 57 A.3d at 1202. This rationale would be stronger if the prosecutor had not referred to Mayo as a defendant during the trial. See N.T. 3/2/92 at 32 (prosecutor's opening), 3/9/92 at 822 (prosecutor's closing). Nevertheless, in light of the entirety of the trial -- openings, closings, evidence, instructions, and the obvious and undeniable fact that the shooter was not on trial -- the Pennsylvania Supreme Court's conclusion is not an unreasonable determination of the governing law or an unreasonable determination of the facts.

From the beginning of the trial, the jury was aware that they would have to determine whether Bennett, Johnson and/or Wyatt (the three co-defendants on trial) committed an intentional murder as either accomplices or co-conspirators, or whether the murder arose from the robbery. N.T. 3/2/92 at 34, 35 (opening statement of Johnson's counsel). During Bennett's counsel's cross-examination of Kecia Ray, he elicited testimony that the group intended to commit a robbery, not to kill someone. N.T. 3/3/92 at 253-54. Although Kecia Ray testified that Bennett gave Mayo the gun used in the

20

robbery, see N.T. 3/3/92 at 194-95, the jury was clearly aware that none of the three on

trial actually pulled the trigger.[14]

When Justice Stout gave the instruction for first degree murder, she stated

> A killing is willful and deliberate if the defendant
> consciously decided to kill the victim and it is premeditated if
> the defendant possessed a fully-formed intent to kill at the
> time when he acted . . . .

N.T. 3/9/92 at 865.  Although the reference to "the defendant" could arguably refer to the

shooter, Mayo, when Justice Stout completed giving the general instructions at the end of

the case and began giving the portion of the charge specific to this case, she stated,

> Now, each of the defendants comes before you
> charged with several crimes.  Each is charged with possessing
> instruments of crimes, each is charged with two bills of
> robbery, each is charged with criminal conspiracy, and each is
> charged with murder.

N.T. 3/9/92 at 856.  Clearly, the justice was referring to only Bennett, Wyatt, and

Johnson, the three on trial.  Again, in beginning the instructions on murder, Justice Stout

referred to "each" defendant.

> Each defendant comes before you charged with murder and
> voluntary manslaughter.

---

[14]It appears that Bennett's and Wyatt's trial strategy was to deny involvement in the robbery.  Although Wyatt testified and admitted knowledge of the planned robbery, he denied participation and testified that it was mere happenstance that he was driving near the jewelry store at the exact time Mayo and Johnson needed a getaway car.  N.T. 3/5/92 at 538-43.  This theory played out in the closing arguments of Bennett's and Wyatt's counsel.  N.T. 3/9/92 at 757 (Wyatt), 767-68 (Bennett).  The strategy does have validity in one very real respect.  If Bennett and Wyatt had been involved in the robbery and the victim was killed during that robbery, they would have been guilty of second-degree murder, which carried a life-sentence.  Total denial of involvement in the robbery was their only way of avoiding life in prison.

> Now, on this bill, you may find each defendant guilty
> of murder in the first degree, guilty of murder in the second
> degree, or guilty of murder in the third degree, or guilty of
> voluntary manslaughter, or not guilty.

N.T. 3/3/92 at 864.  Although the charge on first-degree murder did not specify that the

state of mind of each defendant had to be considered separately,[15] Justice Stout's use of

the phrase "each defendant comes before you" indicated that the jury was to consider

only the three defendants on trial.  Thus, Mayo's intent was irrelevant to the jury's

consideration.[16]

---

[15]The closing arguments of counsel did little to clarify the instruction or stress the necessity for each defendant to harbor the specific intent to kill.  Although Wyatt's counsel said "you have to evaluate the evidence as to each [defendant]," he also stated, "[t]he Commonwealth has to prove that my client, Mr. Wyatt, agreed to commit the gunpoint robbery beyond a reasonable doubt and that he agreed to do so and he participated in it."  See  N.T. 3/9/92 at 737.  Bennett's counsel made no mention of the required intent.  Johnson's counsel was the most helpful, arguing that "the malice from the other guy's acts may be imputed to you for second degree [murder], not first degree, second degree," N.T. 3/9/92 at 791, and that Mayo acted on his own in shooting the jewelry store clerk.  Id. at 796.

[16]The Pennsylvania Supreme Court's decision over-simplifies this analysis by implying that the trial court inserted the word "each" into its first-degree murder instruction.

> Like the instruction in Simpson, the introduction to the
> murder portion of the jury charge clarified that it pertained to
> "each" defendant.  The first-degree murder charge clearly and
> correctly informed the jury that "each" defendant could be
> found guilty of first-degree murder only if "the defendant
> possessed a fully-formed intent to kill at the time when he
> acted."  [N.T. 3/9/92 at 865].  Thus, the jury was properly
> informed that [Bennett] needed to possess the specific intent
> to kill in order for him to be found guilty of first-degree
> murder.

Bennett, 57 A.3d at 1200.  As quoted above, the first-degree murder charge did not state that intent to kill had to be found for each defendant.  See supra at 14.  Had Justice Stout

In order to obtain habeas relief, Bennett must overcome two burdens.  First, he must demonstrate that there is a reasonable likelihood that the jury applied the challenged instructions in a way that violated the Constitution by alleviating the Commonwealth's burden to prove every element of first-degree murder beyond a reasonable doubt.  See Laird, 414 F.3d at 425-26 (citing Smith, 120 F.3d at 411).  Second, in considering his petition, this court must determine whether the state court's determination of the claim was objectively unreasonable, meaning that it was not only erroneous, but also unreasonable.

In this case, the court is faced with an accomplice charge and a conspiracy charge which, when read in isolation, seemingly eliminate the requirement that each defendant harbor the specific intent to kill in order for the Commonwealth to prove first-degree murder.  However, as explained, when read in concert with the entire charge and in light of the evidence, argument, and circumstances of the trial, the Pennsylvania Supreme Court's decision to the contrary is not objectively unreasonable.

### B.    Ineffective Assistance of Counsel

Bennett also presents a claim of ineffective assistance of counsel based on counsel's failure to object to the accomplice and co-conspirator jury instructions.  The District Attorney responds that Bennett is not entitled to relief on this claim.

Claims of ineffective assistance of counsel are governed by Strickland v. Washington, 466 U.S. 668 (1984).  In Strickland, the United States Supreme Court set

---

more clearly specified that the intent had to be considered individually, the requirement for specific intent would certainly be clearer.

23

forth the standard for a petitioner seeking habeas relief on the grounds of ineffective

assistance of counsel.  First, the defendant must show that counsel's performance was

deficient.  This requires showing that counsel made errors so serious that counsel was not

functioning as "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the

defendant must show that the deficient performance prejudiced the defense.  This

requires showing that counsel's errors were so serious as to deprive the defendant of a

fair trial, a trial whose result is reliable.  Id. at 687.  In determining prejudice, the

question is whether there is a reasonable probability that, the result of the proceeding

would have been different.  Strickland, 466 U.S. at 694.  The Third Circuit has held that

counsel will not be considered ineffective for failing to pursue a meritless argument.

Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998).  Having found that there was no

merit to Bennett's underlying due process claim, his counsel will not be found

ineffective.[17]

---

[17]Were I to conclude that Bennett was entitled to relief on his due process claim, he
would still not be entitled to relief on his ineffective assistance of counsel claim because
he has not established prejudice.  In Rainey v. Varner, 603 F.3d 189 (3d Cir. 2010), the
petitioner brought a habeas petition challenging his life sentence for first-degree murder
claiming that counsel was ineffective for failing to challenge the sufficiency of the
evidence to support his first-degree murder conviction (specifically the specific intent to
kill).  The Third Circuit held that, assuming the evidence was insufficient to establish a
shared intent to kill, the evidence was sufficient to establish the elements of second
degree felony murder.  Id. at 202.  Because Rainey had been convicted of robbery and the
evidence clearly established that the death occurred during the robbery, the evidence was
sufficient to support a conviction for second-degree murder.  Id.  Because the sentence
for second-degree murder was life, the Third Circuit concluded that Rainey had failed to
establish any prejudice.  Here, Bennett was also convicted of robbery and the evidence,
including the videotape, established that the victim was killed during the robbery.  The
evidence was sufficient to support a verdict for second-degree murder, which did not
require an element of intent to kill, and which carries the same life sentence he is now

C.    **Certificate of Appealability**

Although I conclude that Bennett's claims do not warrant habeas relief, I will recommend that a certificate of appealability ("COA") issue on Bennett's due process claim.  A COA is appropriate when the petitioner has made a substantial showing of the denial of a constitutional right.  See Local App. R. 22.2; 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322 (2003).  Here, reasonable state jurists have already disagreed regarding the propriety of the charge given in this case in well-reasoned decisions.  Compare Bennett, 19 A.2d at 54 ("charge made no distinction between vicarious liability for first-degree murder and vicarious liability for other charged offenses such as robbery"), Bennett, No. CP-51-CR-0700102-1990, Opinion at 8 (Phila. C.C.P. Oct. 21, 2010) ("The instruction at issue in the case *sub judice* was so erroneous that it deprived [Bennett] of his state and federal constitutional rights to Due Process."), Bennett, 930 A.2d at 1266 n.3 (noting erroneous accomplice liability instruction), Bennett, 842 A.2d at 956, No. 3511 EDA 2001 at 5 (Pa. Super. Feb. 4, 2004) ("there is no doubt that there is merit to [Bennett's challenge to the accomplice liability charge]") and Commonwealth v. Wyatt, No. 2050 EDA 1999 (Pa. Super. Jul. 16, 2001) ("the charge of the court improperly permitted the jury to find [Wyatt] guilty of first degree murder

---

serving.  See Porter v. McCollum, 558 U.S. 30, 40 (2009) (Strickland prejudice prong requires reasonable probability that petitioner's sentence would be different).

without evidence to support that finding), with Bennett, 57 A.3d at 1200 (jury was

"properly informed that [Bennett] needed to possess the specific intent to kill").

Although I conclude that the Pennsylvania Supreme Court's decision was not objectively

unreasonable, the accomplice and conspiracy charges appeared to alleviate the

Commonwealth's burden to prove specific intent for first-degree murder and the murder

instruction was not entirely clear.  Thus, I will recommend a COA issue.

        Therefore, I make the following:

# R E C O M M E N D A T I O N

        AND NOW, this 29th   day of  May      2014, IT IS RESPECTFULLY

RECOMMENDED that the petition for writ of habeas corpus be DENIED.  I FURTHER

RECOMMEND that a certificate of appealability issue.  There has been a substantial

showing of the denial of a constitutional right.  The parties  may file objections to this

Report and Recommendation.  See Local Civ. Rule 72.1.  Failure to file timely objections

may constitute a waiver of any appellate rights.

                              /s/ELIZABETH T. HEY

                              _____

                              ELIZABETH T. HEY
                              UNITED STATES MAGISTRATE JUDGE